# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 25-770L

(Filed: February 5, 2026)

|  |  |
|---|---|
| **STRONG STRUCTURAL STEEL, LTD**, | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) ) |
| **UNITED STATES**, | ) ) ) |
| *Defendant.* | ) ) ) |

*Benigno Martinez*, Martinez & Tijerina PLLC, Brownsville, TX, for plaintiff. *Tomas F. Tijerina*, Martinez & Tijerina PLLC, Brownsville, TX; and *Jason M. Davis* and *H. Jay Hulings* (argued), Davis & Santos, PLLC, San Antonio, TX, Of Counsel.

*Kyle Lyons-Burke* (argued), Natural Resources Section, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs was *Adam R.F. Gustafson*, Principal Deputy Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC.

**OPINION AND ORDER**

**BONILLA**, *Judge*.

Through this action, plaintiff Strong Structural Steel, Ltd (Strong Structural) seeks over $11 million in damages arising out of United States–Mexico border wall construction work initiated under the first Trump administration and paused under the Biden administration. Non-party Southern Border Constructors (SBC), which the government hired to serve as the prime contractor for a portion of the border wall, in turn hired Strong Structural to manufacture steel bollard wall panels and related fencing materials for the project. Strong Structural claims it was left holding the proverbial bag when the United States Army Corps of Engineers (USACE) abruptly halted border wall construction and failed to either take physical possession or provide for the removal and storage of thousands of large bollard wall panels marooned at Strong Structural's manufacturing facility.

Reminiscent of the public debate over who would ultimately pay for the border wall, the parties are deeply divided over who was ultimately responsible for storing the completed bollard wall panels. With respect to the instant motion to dismiss, the

parties principally dispute how the Court should construe Strong Structural's claim. Strong Structural nominally pleads a temporary physical taking of its property for use as a government storage facility without just compensation in violation of the Fifth Amendment to the United States Constitution. Specifically, Strong Structural contends the federal government, acting through USACE, commandeered its manufacturing facility and surrounding property to store the sizable bollard wall panels and related materials following an abrupt pause—and eventual termination—of the construction project. The government counters that Strong Structural's claim sounds only in contract and that, as a subcontractor, Strong Structural would only have enforceable contractual rights against the prime contractor (i.e., SBC) rather than the United States. Asserting that Strong Structural has not shown privity of contract with the United States, the government submits that dismissal is proper for both lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC). For the reasons below, defendant's motion is granted.

## BACKGROUND[1]

Strong Structural operates a steel fabrication facility on family-owned land located in Pharr, Texas, less than five miles from the United States/Mexico border.[2] On September 28 and 29, 2019, United States Customs and Border Protection (CBP), in partnership with USACE, awarded SBC two firm fixed price design/build construction task orders to construct over forty miles of border wall in Starr County and Hidalgo County, Texas.[3] ECF 21-1; ECF 21-2. The total contract value, including options, exceeded $515 million.[4] SBC, in turn, subcontracted with Strong Structural "for the manufacture of large bollard wall panels and other associated parts for the border wall project." ECF 8 at 3. More precisely, on December 6, 2019, and February 5, 2020, SBC placed two purchase orders with Strong Structural totaling

---

[1] These facts are largely drawn from plaintiff's complaint, as amended. By order dated December 23, 2025, in advance of oral argument, the Court directed the parties to jointly file certain documents referenced in—but not appended to—their pleadings. ECF 20 (first citing *Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 696 (2023) (In assessing an RCFC 12(b)(1) motion to dismiss, "[t]he court is not limited to the pleadings to assure itself of its jurisdiction; it may 'inquire into jurisdictional facts' to confirm jurisdiction." (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991))); and then citing *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (In evaluating a complaint for sufficiency under RCFC 12(b)(6), the court is "not limited to the four corners of the complaint. [The court] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" (quoting 5B WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 2004)))).

[2] On December 1, 2012, Strong Structural executed a fifteen-year commercial lease agreement with L&N Strong Family Limited Partnership. ECF 22-1.

[3] For clarity, the prime contractor is listed as Posillico Civil Inc. and Coastal Environmental Group Inc., a joint venture doing business as Southern Border Constructors.

[4] *See* Press Release, U.S. Customs & Border Prot., Contract Awards for New Border Wall System in the Rio Grande Valley (Sep. 30, 2019), *available at* https://perma.cc/97AG-AMAZ.

more than $13 million to manufacture over 14,000 bollard wall panels and related fencing materials (e.g., gates, anchor bolts).[5]  ECF 21-3; ECF 21-4; *see* ECF 21-10 at 11.

Strong Structural began manufacturing the panels—each measuring 8' x 30'—and "stag[ing] them for delivery" in and around the firm's warehouse.  ECF 8 at 3.  As depicted in the photograph below, even stacked twelve high, the panels occupied much of the property:



ECF 8 at 5.[6]  According to the USACE contracting officer, "[b]etween February 2020 and January 2021, the Government inspected and paid for bollard [wall] panels" produced by Strong Structural.[7]  ECF 21-9.  During oral argument, Strong Structural

---

[5] The documents before the Court suggest that SBC may have issued as many as four purchase orders to Strong Structural (i.e., two primary and two supplemental/option orders) totaling nearly $26 million.  During oral argument, plaintiff's counsel represented that only two purchase orders are at issue in this matter, explaining that Strong Structural was manufacturing bollard wall panels for various segments of the southern border wall project for other government contractors.

[6] The Court assumes for purposes of this decision that all the panels in the photograph were manufactured under the two purchase orders at issue in this matter.  *But see supra* note 5.

[7] The December 28, 2023 letter penned by the USACE contracting officer does not specify the volume of bollard wall panels or the amount of the progress payments made to SBC, but notes:

> In accordance with Federal Acquisition Regulations [(FAR)] 52.232-5, paragraph (f) all material covered by progress payments made shall, at the time of payment, become the sole property of the Government.
>
> . . .
>
> The Government understands SBC's subcontractor Strong [Structural] has pending litigation concerning the disposition of panels. This letter is intended to clarify that the Government does have ownership of the panels and costs for storage are pending final settlement [through the termination settlement proposal process].

ECF 21-9.  Adding to the uncertainty, on May 12, 2022, Strong Structural represented to USACE that as of January 2021, nearly 100% of all work was completed on the first purchase order, a supplemental order under the first purchase order, and the second purchase order, whereas less than 50% of the work was completed on a supplemental order under the second purchase order.  ECF 21-10 at 11.

3

likewise represented that it received nearly $13.5 million in progress payments from SBC as of January 2021.[8]

On January 20, 2021, President Joseph R. Biden, Jr., issued Proclamation No. 10142, titled "Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction." 86 Fed. Reg. 7225 (Jan. 20, 2021), *revoked*, 90 Fed. Reg. 8327 (Jan. 20, 2025).[9] The Presidential Proclamation directed the Secretaries of Defense and Homeland Security to pause all current southern border wall construction projects and to pause and redirect obligated funding to the extent permitted by law.

Two days later, in accordance with the President's directive, USACE issued a suspension of work order to SBC for each border wall construction task order. ECF 21-6 (citing FAR 52.242-14); ECF 21-7 (same). The January 22, 2021 suspension of work orders provided in part:

> This suspension of work notification includes procurement, mobilization / demobilization, design, administrative actions, construction, or any other work in furtherance of contract.
>
> By this Notice, you shall hereby suspend all work and tasking immediately, however you must still ensure safety and site security in accordance with the Terms and Conditions of your contract. *You are also hereby restricted from incurring any additional cost against this contract, except those necessary for safety and site security*.

ECF 21-6 (emphasis added); ECF 21-7 (same). The next day, SBC sent Strong Structural a stop-work order for the two purchase orders issued to the subcontractor.[10] Attaching the USACE-issued suspension of work orders, SBC instructed Strong Structural:

---

[8] Notwithstanding the parties' representations, the document proffered to evidence payment to Strong Structural states that before July 15, 2022, SBC had not made any payments to Strong Structural. *See* ECF 21-5 at 2 (Prompt Payment Certification).

[9] President Biden's January 20, 2021 Proclamation terminated Proclamation No. 9844, issued by President Donald J. Trump on February 15, 2019, titled "Declaring a National Emergency Concerning the Southern Border of the United States," 84 Fed. Reg. 4949 (Feb. 15, 2019), *terminated*, 86 Fed. Reg. 7225 (Jan. 20, 2021), *revoked*, 90 Fed. Reg. 8327 (Jan. 20, 2025). President Trump revoked President Biden's January 20, 2021 Proclamation on January 20, 2025 through Proclamation No. 10886, titled "Declaring a National Emergency at the Southern Border of the United States," 90 Fed. Reg. 8327 (Jan. 20, 2025).

[10] To avoid confusion, throughout this decision the Court refers to USACE's directives to SBC as "suspension of work orders" and SBC's directive to Strong Structural as "stop-work order."

4

> Pursuant to the attached Orders, your firm is directed to immediately suspend all work associated with Bollard Wall and Gate placement for the above referenced contracts. This suspension of work notification includes procurement, mobilization/demobilization, design, administrative actions, construction and any other work [in] furtherance [of] Bollard Wall and Gate Placement.
>
> . . .
>
> *Pursuant to the Orders, your firm is restricted from incurring any additional cost against the referenced contracts for the Bollard Wall and Gate placement work.* Accordingly, your firm is directed to provide a detailed and complete summary of all costs incurred due to this suspension daily. Please submit costs daily by **12 noon CST the following day**.

ECF 21-8 (italics added; bold in original).

In the months that followed, Strong Structural sought updates from SBC on the status of the border wall construction project and any request for equitable adjustment that SBC may have submitted to USACE on Strong Structural's behalf. *See, e.g.*, ECF 21-10 at 47–50, 54–57, 59–61. Strong Structural specifically noted the hardship caused by its inability to take on additional work due to SBC's alleged requirement that Strong Structural remain in "standby mode," with the bollard wall panels "parked" at its facility. *Id.* at 60. On April 6, 2021, Strong Structural submitted a supplemental request for equitable adjustment, seeking over $715,000 "to rent additional real estate, load, transport, and unload panels at the rented location and store them until needed for up to 12 months."[11] ECF 21-10 at 54.

On October 8, 2021, USACE formally notified SBC that the border wall construction task orders were "terminated for the convenience of the Government under [FAR] clause 52.249-2," and that the terminations were "effective immediately upon delivery of this Notice."[12] ECF 21-10 at 22. USACE's notice explained that the termination accorded with the January 20, 2021 Presidential Proclamation and more recent direction from the Department of Homeland Security. SBC was directed to "[f]urnish [a] notice of termination to each immediate subcontractor and supplier that will be affected by th[e] termination." *Id.* at 23. Addressing "[s]ettlement[] with

---

[11] While this letter is undated, Strong Structural's follow-up April 14, 2021 correspondence refers to the proposal as "dated 4-6-21." *Compare* ECF 21-10 at 54–55, *with* ECF 21-10 at 59; *see also* ECF 21-10 at 12 (reference to "April 6, 2021 Urgent Change Proposal"). The April 6, 2021 proposal requested an equitable adjustment of $716,838.82. ECF 21-10 at 54; *see* ECF 21-10 at 56–57 (attached spreadsheet totaling same amount). For completeness, on March 9, 2021, Strong Structural advised SBC that it was "currently . . . spending $ 79,000[] per month on leased real estate for panel storage and for painting facilities." ECF 21-10 at 48.

[12] In February 2022, the termination for convenience was converted to a partial termination for convenience. *See* ECF 21-9.

subcontractors[,]" the notice provided: "You remain liable to your subcontractors and suppliers for proposals arising because of the termination of their subcontracts or orders. For purposes of reimbursement by the Government, settlements will be governed by the provisions of FAR Part 49." *Id.* (emphasis omitted). With respect to existing property, the notice included this provision:

> *Property*. As directed or authorized by the undersigned Contracting Officer, you are required to use best efforts to sell or return to vendors fabricated or unfabricated panels and parts, work in progress, completed work, supplies, and other material produced or acquired for the work terminated . . . .
>
>         . . .
>
> The proceeds of any transfer or disposition will be applied to reduce any payments to be made by the Government under this contract, credited to the price or cost of the work, or paid in any other manner directed by the undersigned Contracting Officer.

*Id.* at 25 (emphasis in original).

In accordance with USACE's directions, by letter dated October 14, 2021, SBC terminated the two purchase orders placed with Strong Structural. *Id.* at 21. In the letter, SBC asked Strong Structural to: confirm the "possession and control of any Government-owned material or property" by October 18, 2021; submit any outstanding equitable adjustments related to the January 2021 suspension of work to SBC by November 1, 2021; and submit a termination settlement proposal under FAR 52.249-2 to SBC by November 15, 2021. *Id.*

Strong Structural submitted a termination settlement proposal to SBC on January 28, 2022, in the aggregate amount of over $3.2 million.[13] *See* ECF 21-10 at 3. Strong Structural also submitted to SBC, reportedly after discussions with a CBP official, a request for extraordinary contractual relief under FAR Part 50 and Defense Federal Acquisition Regulation Supplement Part 250, seeking "lost profits/damages" in the aggregate amount of over $3.3 million for the period February through September 2021. *See id.* (referencing *id.* at 29–38). After purportedly being advised by SBC that the request for extraordinary contract relief "does not require sponsorship of the prime [contractor] in order to be submitted to the Government[,]" *see id.* at 3, Strong Structural submitted the $3.3 million certified request directly to USACE on May 12, 2022, *see generally id.*; *see also* ECF 21-11 at

---

[13] A damages analysis dated June 19, 2023, prepared by Strong Structural for submission to USACE, indicated that Strong Structural's total "Potential Recoveries" for termination settlement proposal purposes was nearly $5.8 million. ECF 21-11 at 92. It is unclear what accounts for the delta between this figure and the $3.2 million originally sought. During oral argument, counsel for both parties represented that no final action has been taken on Strong Structural's now-four-year-old termination settlement proposal.

85–86.  Fifteen months later, on August 11, 2023, Strong Structural followed up with a supplemental request for extraordinary contractual relief to USACE to include losses reportedly incurred post-termination (i.e., October 2021 to June 2022).[14]  ECF 21-11.  The relief requested increased to nearly $11.4 million.  *Id.* at 2–12.

On February 20, 2024, USACE denied Strong Structural's request, as supplemented, "because it d[id] not meet the definition of a National Defense contract under P[ublic ]L[aw] 85-804 and because there is insufficient evidence to support the amounts requested."  ECF 21-12 at 1, 3.  USACE also cited the relief available to Strong Structural through a pass-through termination settlement proposal.  *Id.* at 3–4.  Strong Structural filed this action on May 5, 2025.  Briefing on the government's motion to dismiss, as supplemented at the Court's request, was completed on January 14, 2026.  Oral argument was held on January 20, 2026.

## ANALYSIS

### I. Subject-Matter Jurisdiction

The crux of defendant's subject-matter jurisdiction argument is that Strong Structural's claim does not, in substance, lie in a Fifth Amendment taking.  Instead, because the government was acting in a commercial—rather than sovereign—capacity throughout the border wall construction project, Strong Structural's claim necessarily lies in a breach of contract.  As a subcontractor to SBC, the argument continues, Strong Structural lacks privity of contract with USACE.  On this premise, defendant maintains Strong Structural lacks standing to sue the federal government directly and may only do so by way of a prime contractor's pass-through suit under the *Severin* doctrine.  *See W.G. Yates & Sons Constr. Co. v. Caldera*, 192 F.3d 987, 990–91 (Fed. Cir. 1999) (citing *Severin v. United States*, 99 Ct. Cl. 435 (1943)).  While Strong Structural may indeed have an unasserted contract claim, the problem with defendant's argument is that, axiomatically, defendants do not get to decide which claims plaintiffs do and do not pursue.  Borrowing language from this Court's rejection of "the government['s] . . . attempt[] to rewrite [a complaint] so as [to] avoid this Court's jurisdiction" in another matter: "The plaintiff . . . is 'the master of the complaint,' and this Court will not reimagine the [complaint] here for the government's benefit."  *Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 637 (2020) (first quoting *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002); and then citing *Mients v. United States*, 50 Fed. Cl. 665, 671 (2001)).

As pled, Strong Structural charges that after inspecting and purchasing more than 14,000 bollard wall panels from Strong Structural through SBC, the federal government effectively commandeered Strong Structural's manufacturing facility

---

[14] In or about June 2022, Strong Structural hired Kiewit Corporation to move roughly one-third of the bollard wall panels to an offsite location.  ECF 21-11 at 4, 9–10, 84.  Aside from the reported $45,000 monthly lease for offsite storage, Strong Structural does not account for the relocation expenses incurred, including any payments to Kiewit.  The above-noted June 2022 end date for requested damages coincides with this partial relocation of the bollard wall panels.  ECF 21-11 at 4.

7

and surrounding property to store the sizeable fencing materials after pausing (and then terminating) the border wall construction project. According to Strong Structural, moreover, the designated delivery point of the fencing materials was reportedly the staging area surrounding Strong Structural's manufacturing facility, and, as quoted *supra*, in abruptly pausing construction, USACE directed that no additional costs be incurred under the contract save those related to security and safety. In sum and substance, Strong Structural alleges that USACE abandoned government-owned property occupying nearly the entirety of its land and directed that no costs be incurred to move it for a period ultimately lasting seventeen months (i.e., January 2021 to June 2022).

To be clear, plaintiff's takings theory appears novel. Neither party identified, and the Court did not find in its own research, any other case where a court considered whether the government's failure to remove government-purchased materials from the subcontractor's property amounted to a taking. But the seeming novelty of this theory, and its relation to a federal procurement, do not wrest Strong Structural's claim from the Court's takings jurisdiction particularly in light of the well-pleaded complaint rule.[15, 16]   *See Acceptance Ins. Cos. v. United States*, 503 F.3d 1328, 1335–36 (Fed. Cir. 2007) (collecting cases).

---

[15] On the limited record presented, the Court is unable to conclusively determine whether the government's conduct constitutes a trespass—i.e., a tort claim outside this Court's subject-matter jurisdiction—or a taking. *See Noll v. United States*, No. 24-1174, 2024 WL 3517627, at *3 (Fed. Cir. July 24, 2024) (per curiam) ("The Tucker Act and our case law interpreting the Act are clear that the Court of Federal Claims does not have jurisdiction over tort claims, including trespass and fraud." (first citing 28 U.S.C. § 1491(a); and then citing *Souders v. S.C. Pub. Serv. Auth.*, 497 F.3d 1303, 1307 (Fed. Cir. 2007))). At oral argument, plaintiff's counsel suggested it might be both. If a possessory interest in the subject property is taken by the government, however, it necessarily belongs to the government and thus cannot be trespassed by the government. *See Trespass*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("An unlawful act committed against the person or property *of another* . . . ." (emphasis added)); *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (discussing "[t]he line distinguishing potential physical takings from possible torts"). Absent further factual development, deciding this taking-versus-trespass issue would be imprudent. *See Oswalt v. United States*, 41 F. App'x 471, 472 (Fed. Cir. 2002) (per curiam).

[16] During oral argument, the government raised the issue of ripeness, citing Strong Structural's purported failure to exhaust its administrative remedies under the FAR prior to filing this Fifth Amendment takings claim. Although not addressed in the government's briefs, the Court must consider this jurisdictional issue. *See Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) ("Subject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte*." (citing *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir. 1998))). In support, the government cited dicta in *Piszel v. United States*: "The Supreme Court has held that a claimant must exhaust administrative or judicial remedies against the relevant government entity in order for his regulatory takings claim to be ripe." 833 F.3d 1366, 1375 (Fed. Cir. 2016) (citing *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186–87 (1985), *overruled by*, *Knick v. Township of Scott*, 588 U.S. 180 (2019)) (additional citations omitted). But the administrative exhaustion requirement was later abrogated—and *Williamson County* was explicitly overruled—by the Supreme Court's decision in *Knick*. *Knick*, 588 U.S. at 189–90, 206 ("The Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner."); *accord Pakdel v. City & County of San Francisco*, 594 U.S. 474, 481

## II.   Failure to State a Claim

Alternatively seeking dismissal for failure to state a claim upon which relief can be granted under RCFC 12(b)(6), the government makes three arguments. First, recasting the breach of contract argument rejected above, defendant asserts that Strong Structural's potential relief lies exclusively in its contractual arrangement with the prime contractor (i.e., SBC) rather than the constitutional takings claim pursued here. In making this argument, the government again misconstrues the right sought to be vindicated: Strong Structural's "leasehold interest and exclusive possessory rights in the subject property."[17] ECF 8 at 3. This is precisely the type of right the Fifth Amendment protects. *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993) (holding government subcontractor's "rights to control the use of [its] warehouse and to exclude others from its property" were "property interests . . . within the protection of the Fifth Amendment"). Again, the government cannot rewrite Strong Structural's complaint.

Second, the government argues "there is no taking because the government has not taken Strong Structural's right to legal remedies for any breach of contract." ECF 13 at 13. In support, defendant cites *Piszel* for the proposition that interference with a contractual right constitutes a taking only where "'the government . . . substantially take[s] away the right to damages in the event of a breach.'" ECF 13 at 13 (quoting *Piszel*, 833 F.3d at 1377). This argument succumbs to the same fault as the last: Strong Structural asserts that the government interfered not with a contractual right, but a possessory interest in real property. *Piszel* is inapposite. In *Piszel*, the federal government directed the Federal Home Loan Mortgage Corporation (a/k/a Freddie Mac)—a government-sponsored enterprise under a federal conservatorship—to terminate an executive's employment without honoring the previously negotiated severance package. 833 F.3d at 1371–72. Rather than sue Freddie Mac for breach of his employment agreement, the former executive brought a takings claim (and, alternatively, an illegal exaction claim) against the federal government to recoup his severance pay. *Id*. at 1372. The operative claim in *Piszel* was that the government took plaintiff's contractual rights and benefits. Not so, concluded the Federal Circuit, explaining: "The government's instruction to Freddie Mac did not take anything from [the former executive] because, even after the government's action, [the former executive] was left with the right to enforce his contract against Freddie Mac in a breach of contract action." *Id*. at 1377. Here, by contrast, Strong Structural alleges not that USACE took any *contractual* rights

---

(2021) ("Of course, Congress always has the option of imposing a strict administrative-exhaustion requirement[] . . . . But it has not done so for takings plaintiffs." (internal citations omitted)).

[17] Strong Structural reiterates its unequivocal choice to assert property rights throughout the operative complaint. *See, e.g.*, ECF 8 at 5 ("The Government's refusal to act . . . effectively deprived Strong [Structural] of the use of its fabrication facilities and the equipment thereon for years . . . ."); *id*. ("The Government's actions . . . occupied and controlled the subject property, both the leased real estate and fabrication equipment . . . ."); *id*. at 6 ("[T]he USACE's Suspension of Work Order to SBC . . . rendered the subject property unavailable for any other productive use.").

Strong Structural may have against SBC, but that USACE took its exclusive *property* rights in its manufacturing facility and surrounding land.

Finally, the government argues that USACE's alleged conduct is not the type of government action that can effect a Fifth Amendment taking. On this point, the Court agrees. Per the operative complaint, the government action that effected the Fifth Amendment taking of Strong Structural's property was USACE's abrupt pause and eventual termination of the border wall construction project. Crucially, USACE's directives were addressed to SBC and impacted Strong Structural only indirectly, through SBC.

While the government may effect a taking through a third party, "a compensable taking does not occur unless the government's actions on the intermediate third party have a 'direct and substantial' impact on the plaintiff asserting the takings claim." *Casa de Cambio Comdiv S.A., de C.V. v. United States*, 291 F.3d 1356, 1361 (Fed. Cir. 2002); *accord YMCA v. United States*, 395 U.S. 85, 93 (1969). The bar for plausibly alleging that the government's actions with respect to a third party had a sufficiently "direct and substantial" impact on a plaintiff is quite high. *Casa de Cambio* is illustrative and has been aptly summarized as follows:

> [The Federal Circuit] held that the depositor of [a] stolen Treasury check (Casa) could not maintain a taking claim when the Federal Reserve Bank, upon discovering that the Treasury check it had paid had been stolen, recouped the proceeds of the check from the presenting bank (Norwest), which, in turn, debited the depositor's account. Surveying numerous cases, the Federal Circuit found that "[b]ecause the government did not direct Norwest to take action against Casa, and because Norwest did not act as the alter ego or agent of the government, Casa has not stated a claim for relief under the Takings Clause."

*Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 683–84 (2002) (quoting *Casa de Cambio*, 291 F.3d at 1363), *appeal dismissed*, 60 F. App'x 808 (Fed. Cir. 2003). That is, the government recouped the plaintiff's wrongfully deposited money from the plaintiff's bank (a third party), triggering the bank to recoup that money from the plaintiff's account. The third-party bank's decision to recoup the money from the plaintiff's account was all but inevitable once the government had recouped the money from the bank; yet because it was the *bank's* decision, and because the bank was not acting as the government's agent when it made that decision, the government's act did not "direct[ly] and substantial[ly]" impact the plaintiff. *Casa de Cambio*, 291 F.3d at 1363.

This case is analogous. Just as the third-party bank in *Casa de Cambio* decided to recoup money from the plaintiff's account rather than absorb the financial loss itself, third party SBC decided to "direct[] Strong [Structural] to halt all work and maintain standby operations" rather than risk absorbing any additional costs itself. ECF 8 at 4; *compare* ECF 21-6 (USACE-to-SBC suspension of work orders), *and* ECF 21-7 (same), *with* ECF 21-8 at 1 (SBC-to-Strong Structural stop-work

10

order).[18]  In both cases, while the harm plaintiff sustained was a foreseeable consequence of the government's action, that harm was ultimately inflicted by the independent and discretionary act of a third party.

Like the domino effect argument rejected above, Strong Structural's agency theory of liability must similarly fail.[19]  The mere fact that SBC was a government *contractor* does not make SBC a government *agent*.  In the context of bid protests, for example, the Federal Circuit recently discussed cases where prime contractors effectively served as agents of the federal government, explicitly noting that such instances are "isolated." *Percipient.AI, Inc. v. United States*, 153 F.4th 1226, 1242 (Fed. Cir. 2025) (en banc) (collecting cases), *cert. denied*, __ S. Ct. __, No. 25-428, 2026 WL 79975, at *1 (Jan. 12, 2026).  The same holds true in Contract Disputes Act cases.  *See Lockheed Martin Corp. v. United States*, 50 Fed. Cl. 550, 562–63 (2001) (discussing the "purchasing agent" exception under the Contract Disputes Act), *aff'd*, 48 F. App'x 752 (Fed. Cir. 2002).  Here, the operative pleading describes SBC simply as "the prime contractor," ECF 8 at 3, and there is no assertion or indication that the government's relationship with SBC was any closer than the typical government/prime contractor affiliation.

Further, Strong Structural does not plausibly allege that the government's suspension of work orders prohibited SBC or Strong Structural from relocating the bollard wall panels for off-site storage.  In fact, the USACE-to-SBC suspension of work orders simply stated: "You are . . . hereby restricted from incurring any additional cost against this contract, except those necessary for safety and site security."  ECF 21-6 at 1; ECF 21-7 at 1.  SBC then sent a similar instruction to Strong Structural: "Pursuant to the [USACE] Orders, your firm is restricted from incurring any additional cost against the referenced contracts for the Bollard Wall and Gate placement work."  ECF 21-8 at 1.  At best, the directives placed SBC and, in turn, Strong Structural on notice that their decisions to expend additional monies risked non-reimbursement.  Nothing in the notices, however, prohibited SBC or Strong Structural from moving the bollard wall panels to an offsite storage facility at their own expense and then seeking (non-guaranteed) reimbursement.  As noted *supra*, that is precisely what Strong Structural opted to do in June 2022.[20]  To be sure, Strong Structural's choice between storing the panels on its property and paying

---

[18] The USACE suspension of work orders issued to SBC and SBC's follow-on stop-work order sent to Strong Structural are incorporated by reference in the operative complaint and, thus, properly considered by the Court in resolving this issue.  *See supra* note 1.

[19] Strong Structural's assertion that SBC is a government agent is not a factual allegation that the Court is required to credit but a legal conclusion subject to the Court's scrutiny.  *See B&G Enters., Ltd. v. United States*, 220 F.3d 1318, 1322–23 (Fed. Cir. 2000) (describing issue of whether an agency relationship existed as a legal, not factual, issue); *Groundbreaker Dev. Corp. v. United States*, 163 Fed. Cl. 619, 623 (2023) ("Although the court must 'accept as true all of the factual allegations contained in the complaint,' legal conclusions in the complaint are not presumed to be true . . . ." (first quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); and then citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).

[20] *See supra* note 14.

out-of-pocket to move them elsewhere presented two undesirable options. Like Odysseus's choice between sailing closer to Scylla or Charybdis, however, Strong Structural nonetheless had a choice. Its failure to act sooner did not convert the government's pause and eventual termination of the border wall construction project into a Fifth Amendment taking.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss (ECF 13) is **GRANTED**. Plaintiff's complaint (ECF 1), as amended (ECF 8) is **DISMISSED** without prejudice under RCFC 12(b)(6). The Clerk of Court is directed to enter judgment accordingly. No costs.

It is so **ORDERED**.

Armando O. Bonilla
Judge